IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PRAVEENA DEVI NATH,

           Plaintiff,                    No. 2:11-cv-1441 GGH

    vs.

MICHAEL J. ASTRUE,             <u>ORDER</u>
Commissioner of
Social Security,

           Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and judgment is entered for defendant.

<u>BACKGROUND</u>

        Plaintiff, born October 24, 1969, applied on November 2, 2007 for DIB alleging that she became disabled on May 1, 2007. (Tr. at 15, 120.) Plaintiff contended that she was unable to work primarily due to back pain, neck pain, a left knee injury, and severe headaches. (Tr. at 147.)

In a decision dated November 6, 2009, Administrative Law Judge ("ALJ") Sara A. Gillis determined that plaintiff was not disabled.  (Tr. at 26.)  The ALJ made the following findings:[1]

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2.   The claimant has not engaged in substantial gainful activity since May 1, 2007, the alleged onset date (20 CFR § 404.1571 *et seq*.).
>
> 3.   The claimant has the following severe impairments: degenerative disc disease of the cervical, thoracic and lumbar spine with history of cervical, thoracic and lumbar strain, history of left knee arthroscopy with residual osteoarthritis, history of post concussive syndrome and benign positional vertigo and borderline intellectual functioning (20 CFR 404.1520(c)).

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program.  42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally balance, kneel, crouch, climb ramps/stairs, and crawl; cannot climb ladders, ropes and scaffolds; must avoid concentrated exposure to hazards; and can perform simple repetitive tasks, i.e. unskilled labor only.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on October 24, 1969 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2007 through the date of this decision (20 CFR 404.1520(g)).

(Tr. at 15-26.)

ISSUES PRESENTED

Plaintiff's motion presents three issues for review: (1) whether the ALJ improperly rejected the opinion of plaintiff's treating physician; (2) whether the ALJ erred in failing to credit plaintiff's testimony and a third-party statement as to the nature and extent of her

3

1  functional limitations; and (3) whether the ALJ erred in failing to credit the vocational expert's

2  testimony in response to the hypothetical that reflected plaintiff's limitations as assessed by her

3  treating physician.

4  LEGAL STANDARDS

5          The court reviews the Commissioner's decision to determine whether (1) it is

6  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

7  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

8  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

9  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

10 as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

11 625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

12 ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

13 resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

14 omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

15 than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

16 ANALYSIS

17          Whether the ALJ Improperly Rejected the Opinion of Plaintiff's Treating

18          Physician

19          Plaintiff contends that the ALJ failed to provide specific and legitimate reasons

20 for rejecting the opinion of her treating physician and primary care provider, Dr. Dwain

21 Rickertsen.

22          The weight given to medical opinions depends in part on whether they are

23 proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

24 \\\\\

25 \\\\\

26 \\\\\

4

F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]
Ordinarily, more weight is given to the opinion of a treating professional, who has a greater
opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d
1273, 1285 (9th Cir. 1996).

       To evaluate whether an ALJ properly rejected a medical opinion, in addition to
considering its source, the court considers whether (1) contradictory opinions are in the record;
and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a
treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81
F.3d at 830-31.  In contrast, a *contradicted* opinion of a treating or examining professional may
be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating
professional's opinion generally is accorded superior weight, if it is contradicted by a supported
examining professional's opinion (supported by different independent clinical findings), the ALJ
may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing
Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to
weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[3] except that the ALJ
in any event need not give it any weight if it is conclusory and supported by minimal clinical
findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,
minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a
non-examining professional, without other evidence, is insufficient to reject the opinion of a

---

[2]  The regulations differentiate between opinions from "acceptable medical sources" and
"other sources."  See 20 C.F.R. §§ 404.1513(a), (e); 416.913(a), (e).  For example, licensed
psychologists are considered "acceptable medical sources," and social workers are considered
"other sources."  Id.  Medical opinions from "acceptable medical sources" have the same status
when assessing weight.  See 20 C.F.R. §§ 404.1527(a)(2), (d); 416.927(a)(2), (d).  No specific
regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
accordingly are given less weight than opinions from "acceptable medical sources."

[3]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

1 | treating or examining professional.  Lester, 81 F.3d at 831.

2 | In this case, plaintiff, while working as a cook supervisor in a prison, fell
3 | backwards off a step stool and onto a cart of groceries.  (Tr. at 226, 239.)  She complained of left
4 | shoulder, neck, and lower back pain and was assessed with neck, back, and shoulder sprain.  (Tr.
5 | at 226.)  She also developed symptoms of numbness in the left arm and hand, pain radiating from
6 | her lower back into the left buttock and leg, headaches associated with her neck pain, and
7 | dizziness.  (Tr. at 207, 211, 240.)  However, X-rays taken in February 2007 showed a grossly
8 | normal thoracic and lumbar spine.  (Tr. at 234-35.)  On March 19, 2007, Dr. Steven Patwell, one
9 | of plaintiff's treating physicians at Sutter North Medical Group, stated that the MRIs of
10 | plaintiff's cervical, thoracic, and lumbar spine were "entirely normal" and encouraged plaintiff to
11 | increase activity to speed up her recovery.  (Tr. at 204, 229-33.)  Dr. Patwell also noted: "It is my
12 | impression the way this lady's pain pattern is going at the two-month mark that this is going to be
13 | a long, drawn-out somatic subjective pain case...I think there is a poor prognosis."  (Tr. at 204.)
14 | Subsequently, on March 28, 2007, orthopaedic surgeon Dr. Donald Harrington, another one of
15 | plaintiff's treating physicians, examined plaintiff and observed that X-rays of her lumbosacral
16 | spine done that day showed no fracture or dislocation and good alignment.  There appeared to be
17 | some moderate narrowing of the L5-S1 disk space, but no spondylosis or spondylolisthesis was
18 | noted.  (Tr. at 244, 261.)  He noted no signs of peripheral neuropathy.  (Tr. at 244.)

19 | After being returned to full work duty in late April 2007, on May 1, 2007, plaintiff
20 | was involved in a single car accident when she became dizzy, blacked out, and hit a tree.  (Tr. at
21 | 249-50.)  Plaintiff indicated that she injured both knees, her right shoulder, the right side of her
22 | neck, her anterior chest and abdomen from the seatbelt, her left buttock, her thoracic spine, and
23 | her lumbar spine.  (Tr. at 251.)  X-rays of plaintiff's shoulders and knees from the day of the
24 | accident showed "no acute bony trauma," and CT scans of her cervical spine and head were
25 | normal.  (Tr. at 253.)  Furthermore, EMG and nerve conduction studies of the upper extremities
26 | done a little more than a week after the accident were normal.  (Tr. at 252.)

1    By August 28, 2007, Dr. Harrington determined that plaintiff was permanent and

2    stationary and was capable of returning to work at full duty, at least from the standpoint of her

3    January 2007 work injury.  (Tr. at 258.)  Her physical examination revealed some limitation to

4    her range of motion and "generalized subjective tenderness" in the lumbar and cervical spine

5    with "no hard evidence of lumbar or cervical nerve root irritation."  (Tr. at 257-58.)  Dr.

6    Harrington noted that her symptoms were lasting longer and to a greater degree than would be

7    anticipated, and that plaintiff had complaints that he could not "explain on an anatomic basis."

8    (Tr. at 258-59.)

9    The medical evidence in the record indicates that from 2007 to 2009, plaintiff's

10   primary care provider, Dr. Rickertsen, documented his efforts to address plaintiff's continuing

11   complaints of neck, back, and knee pain, as well as headaches and dizziness, through medication,

12   physical therapy, and referrals to various specialists, without any significant medical findings or

13   apparent notable relief from symptoms.

14   Due to plaintiff's complaints of headaches, dizziness, memory loss, as well as her

15   apparent blackout while driving, Dr. Rickertsen referred plaintiff to a neurologist, Dr. Wenchiang

16   Han.  (Tr. at 334-35, 344.)  On May 15, 2007, Dr. Han diagnosed plaintiff with benign positional

17   vertigo as a result of the work injury and noted that the memory loss, headaches, and other

18   symptoms were most likely due to postconcussion syndrome.  (Tr. at 335.)  An EEG study

19   performed May 22, 2007 was normal.  (Tr. at 344.)  On June 4, 2007, a CVL venous duplex scan

20   ruled out deep venous thrombosis in the left leg.  (Tr. at 342.)  A June 20, 2007 MRI of

21   plaintiff's lumbar spine showed mild to moderate dextroscoliosis associated with mild facet

22   arthropathy, no significant central or lateral stenosis, and no evidence of a herniated disc.  (Tr. at

23   358.)

24   By July 10, 2007, Dr. Han indicated that her vertigo had resolved and her memory

25   loss had improved, and recommended a facet joint block or cortisone shots for her neck pain and

26   associated headache.  (Tr. at 327-28.)  Subsequently, on November 8, 2007, Dr. Han observed

7

that plaintiff had a stable gait, improved vertigo, no evidence of occipital neuralgia, normal cranial nerves, and normal motor and sensory reflexes.  (Tr. at 324.)  Due to continuing complaints of neck pain and headaches, Dr. Han referred plaintiff to have a facet joint block.  (Tr. at 324.)  On February 7, 2008, Dr. Han stated that a thoracic spine MRI done on December 5, 2007 and a cervical spine MRI done on November 13, 2007 were normal.  (Tr. at 509, 521-22.)  Noting that there were some insurance coverage issues, Dr. Han stated that they would continue to pursue a facet joint block.  (Tr. at 509-10.)  As of April 8, 2008, plaintiff continued to complain of neck and lower back pain, but Dr. Han found no visible atrophy, no hyperreflexia, and no signs of myelopathy, again recommending a facet joint block or an epidural steroid injection.  (Tr. at 508.)  Thereafter, on June 25, 2008, Dr. Han reported that plaintiff walked with a crutch, limped, and continued to experience headaches, back pain, and neck pain, but that an MRI of her lumbar spine and a CT head scan were unremarkable and that she was receiving epidural steroid injections from Dr. Alghannam.  (Tr. at 552-53.)  Finally, on October 15, 2008, Dr. Han noted that plaintiff's pain characteristics remained the same and that she walked with a crutch, but that her passive range of motion was intact with no significant limitation and that there was no focal sensory loss, no significant muscle atrophy, and no severe swelling.  (Tr. at 550.)  Plaintiff was instructed to continue with medications.  (Tr. at 551.)

With respect to plaintiff's left knee pain, after a June 20, 2007 MRI of the left knee showed a partial ligament rupture, plaintiff underwent arthroscopic knee surgery in September 2007 performed by orthopaedic surgeon Dr. Garry Vallier.  (Tr. at 309-10, 360.)  About a week after the surgery, Dr. Vallier recommended that plaintiff stop using crutches and advance to weight bearing.  (Tr. at 310.)  By February 2008, Dr. Vallier stated that plaintiff continued to complain of left knee pain with episodes of near giving way and that she still uses a crutch.  (Tr. at 465.)  He noted no swelling and that the place where the knee was originally tender was "almost completely nontender now," diagnosed her with left knee patellar tendonitis, prescribed her a patellar tendon strap, and released her from his regular care.  (Tr. at 465.)

1    In light of plaintiff's chronic low back pain, Dr. Rickertsen also referred plaintiff

2  for evaluation by a spinal surgeon, Dr. Ardavan Aslie.  (Tr. at 529.)  Upon physical examination

3  performed on November 21, 2007, Dr. Aslie found no signs of edema, capillary refill was less

4  than 2 seconds in all toes, sensation was intact to light touch bilaterally in both the lower and

5  upper extremities, motor examination showed that all muscle groups were within physiological

6  range bilaterally in the lower and upper extremities, reflexes were normal, and straight-leg-

7  raising was negative bilaterally.  (Tr. at 529.)  He also stated that plaintiff could forward bend to

8  about 60 degrees and extend without any extension jog.  (Tr. at 529.)  Dr. Aslie noted that an

9  MRI of the cervical spine showed some small herniations that were not significant surgically.

10  (Tr. at 530.)  He stated that an MRI of the lumbar spine indicated that the disk at the L5-S1 level

11  was minimally developed and could predispose plaintiff to a possible injury, but that he did not

12  see a surgically correctable lesion at that time.  (Tr. at 530.)  He further requested an MRI of the

13  thoracic spine, which was subsequently determined to be normal.  (Tr. at 521, 530.)

14    On December 11, 2007, state agency physician Dr. Jerome H. Becker reviewed

15  plaintiff's medical records and completed a physical residual functional capacity assessment

16  form.  (Tr. at 453-57.)  He opined that plaintiff was essentially capable of performing light work;

17  more specifically, plaintiff was capable of lifting up to 20 pounds occasionally and up to 10

18  pounds frequently, standing and/or walking with normal breaks for a total of 6 hours in an 8-hour

19  workday, sitting with normal breaks for a total of 6 hours in an 8-hour workday, and was

20  otherwise unlimited in her ability to push and pull.  (Tr. at 454.)  He also stated that plaintiff

21  could frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently

22  balance and stoop; and occasionally kneel, crouch, and crawl.  (Tr. at 455.)  Dr. Becker indicated

23  that he based his conclusions on the fact that plaintiff had undergone a left knee arthroscopy, the

24  CT scan of her cervical spine was normal, her vertigo had improved, her motor examination was

25  5/5, her EEG was normal, the CT scans of her head, neck, chest, abdomen, and pelvis were all

26  within normal limits, and her laboratory tests/panels were normal.  (Tr. at 454.)  He noted that

1    plaintiff was partially credible, i.e., that her complaints [were] outweighed [by] the objective

2    findings.  (Tr. at 457.)  After review of subsequent medical evidence, Dr. Becker's physical RFC

3    assessment was affirmed on July 9, 2008.  (Tr. at 538-39.)

4            On July 2, 2008, Dr. Rickertsen completed a "statement of functionality"

5    indicating that plaintiff could sit for a total of 2 hours a day; stand and walk for a total of 1 hour a

6    day; lift/carry up to 10 pounds without restriction; occasionally lift/carry 11-20 pounds; never

7    lift/carry greater than 20 pounds; frequently finger and handle objects and drive; occasionally

8    bend at the waist and reach above the shoulder, at waist/desk level, and below waist/desk level;

9    and never kneel or stoop.  (Tr. at 612-13.)  He also stated that plaintiff could not participate in

10   vocational rehabilitation services.  (Tr. at 613.)

11           Subsequently, Dr. Rickertsen requested additional MRIs.  A January 20, 2009

12   MRI of plaintiff's cervical spine showed a tiny posterior central C3-4 disk protrusion with no

13   evidence of stenosis and slight cerebellar tonsillar ectopia.  (Tr. at 557.)  A lumbar spine MRI

14   taken that same day was normal with partial lumbarization of S1.  (Tr. at 558.)  Dr. Rickertsen

15   also conducted electrodiagnostic testing.  Based on a March 25, 2009 sensory conduction study,

16   he presumptively diagnosed plaintiff with lumbosacral plexopathy without motor deficit.[4]  (Tr. at

17   565-68.)  Additionally, based on an April 2, 2009 sensory conduction study, he further

18   presumptively diagnosed plaintiff with cervical plexopathy without motor deficit.  (Tr. at 561-

19   64.)

20           Thereafter, on July 31, 2009, Dr. Rickertsen completed a physical residual

21   functional capacity evaluation in support of plaintiff's social security disability benefits claim.

22   (Tr. at 571-74.)  He stated that he had been treating plaintiff since May 2007 and saw her

23

24        [4] "Plexopathies are a form of peripheral neuropathy (i.e., a form of damage to peripheral
     nerves).  Common plexopathies include brachial plexopathy affecting the upper thorax (chest and
25   upper back), arm, and shoulder region, cervical plexopathy affecting the neck and head, and
     lumbosacral plexopathy affecting the lower back and legs."  Gale Encyclopedia of Neurological
26   Disorders, Volume 2 at 678 (2005).

1   approximately every 2-3 weeks for back and neck pain, headaches, and left knee pain and injury.

2   (Tr. at 571.)  His principal diagnosis was low back pain with radiculopathy, and his secondary

3   diagnoses were neck pain, degenerative disc disease, left knee pain, bilateral numbness in the

4   feet, and headaches, with an onset date of May 2007.  (Tr. at 571.)  He based his diagnoses on

5   examinations, MRIs, and nerve conduction testing.  (Tr. at 571.)  Dr. Rickertsen opined that

6   plaintiff could stand/walk for a total of 2 hours in an 8-hour work day and 15-20 minutes without

7   interruption; could sit for a total of 2 hours in an 8-hour work day and 15-20 minutes without

8   interruption, constantly elevating her legs above heart level while sitting; was unable to work for

9   any number of hours; and would have difficulty maintaining sustained/prolonged posturing of the

10  neck.  (Tr. at 572.)  When asked what medical findings support these limitations, Dr. Rickertsen

11  referenced increased pain and limited range of motion, "exam," and headaches.  (Tr. at 572.)

12          Dr. Rickertsen further opined that plaintiff could occasionally (from very little up

13  to 1/3 of an 8-hour day) bend, balance, and stoop; could never climb, crouch, crawl, or kneel;

14  could occasionally (less than 1/3 of an 8-hour day) lift up to 5 pounds; could frequently (1/3 - 2/3

15  of an 8-hour day) reach with her right hand/arm, handle with her right hand, and finger with her

16  right and left hand; and could rarely or never reach with her left hand/arm or handle with her left

17  hand.  (Tr. at 572-73.)  He did not provide any specific medical findings in support of these

18  limitations.  Dr. Rickertsen stated that plaintiff should avoid exposure to heights, moving

19  machinery, temperature extremes, dust, and vibration based on her "history taken."  (Tr. at 573.)

20  He further indicated that plaintiff needed to lie down and elevate her feet about 6-7 times a day

21  based on her "history" and medications that cause drowsiness.  (Tr. at 573.)  He assessed her pain

22  as being 7-8 out of 10 chronically and 8 out of 10 at worst.  (Tr. at 573.)  He noted that he

23  expected deterioration in plaintiff's condition and that she would need chronic management.  (Tr.

24  at 574.)

25  \\\\\

26  \\\\\

1    After summarizing the medical evidence regarding plaintiff's physical

2 impairments[5] and noting that Dr. Rickertsen released plaintiff from work due to her symptoms

3 from 2007 through 2009, the ALJ analyzed Dr. Rickertsen's opinion as follows:

> While the opinion of a treating physician is accorded great
> deference due to the length of the relationship and the regular
> interaction, in this case little weight can be given to the entirety
> [of] this opinion.  As indicated above, it is inconsistent with the
> objective clinical findings, numerous imaging studies documenting
> claimant's spine and head to be all within normal limits.  The
> severe restrictions opined are simply unsupported in the medical
> record, and to some degree appear based on the claimant's history
> and subjective complaints, rather than the facts of her condition.  In
> addition, claimant testified that her license has been reinstated,
> which must have been done with the involvement of her treating
> physician and certain of the limitations assessed simply fly in the
> face of having driving privileges.  Lastly, the claimant's activities
> of daily living are more expansive than these limitations would
> allow again supporting a finding that this opinion should be given
> little weight.  However, acknowledging the claimant's unresolved
> chronic pain of some degree, the residual functional capacity
> assessed above finds her sedentary in her exertional level.
>
> The State Agency examiner Dr. Jerome Becker found the claimant
> could perform light work based on the record, with some postural
> limitations.  (11F)  Significant weight is given to postural
> limitations, however given her ongoing tendonitis in the left knee,
> little weight is given to the finding that her residual functional
> capacity is for light work, and rather it is found to be limited to less
> than sedentary work as established above.

17 (Tr. at 23.)

18    The court finds the ALJ's assessment of the medical evidence to be supported by

19 substantial evidence and by the record as a whole.  While a treating physician should certainly

20 take into account the claimant's reported symptoms in his evaluation, the court agrees that Dr.

21 Rickertsen's opinion as to plaintiff's limitations appears to be based almost entirely on plaintiff's

22 subjective complaints and history of symptoms.  Indeed, Dr. Rickertsen's RFC assessments and

23 treatment notes contain very few objective test results and findings justifying the severe

24 _____

25    [5] Plaintiff was also diagnosed with borderline intellectual functioning and the ALJ consequently limited plaintiff to simple, repetitive tasks, i.e. unskilled labor.  Plaintiff does not appear to contest the ALJ's findings with respect to the mental component of her RFC

26 assessment.

1  limitations imposed and rely heavily on plaintiff's own account of her symptoms.  Tommasetti v.

2  Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion

3  if it is based to a large extent on a claimant's self-reports that have been properly discounted as

4  incredible.")

5         To be sure, it is possible to isolate some quantum of evidence to at least partially

6  support Dr. Rickertsen's opinion.[6]  For example, plaintiff points to nerve conduction studies

7  conducted in March and April 2009 which had abnormal results and yielded Dr. Rickertsen's

8  presumptive diagnosis of plexopathy/neuropathy.  (Tr. at 561-68.)  However, as the ALJ

9  correctly noted, these findings are significantly outweighed by the numerous imaging studies

10  (MRIs, CT scans, X-rays, etc.) showing normal results or evidencing merely mild or moderate

11  degenerative changes, as well as the diagnoses of plaintiff's other treating providers.  (Tr. at 22.)

12  Orthopaedic surgeon Dr. Harrington expressly found no signs of peripheral neuropathy after

13  plaintiff's work accident and continued to find no hard evidence of lumbar or cervical nerve root

14  irritation several months after her car accident.  (Tr. at 244, 258.)  EMG and nerve conduction

15  studies of the upper extremities done after the car accident on May 9, 2007 were normal.  (Tr. at

16  252.)  Spinal surgeon Dr. Aslie did not recommend surgery in November 2007.  (Tr. at 529-30.)

17  Moreover, plaintiff's treating neurologist, Dr. Han, despite following plaintiff's care for at least

18  over a year, made no diagnosis of plexopathy or peripheral neuropathy.  In November 2007, Dr.

19  Han found that plaintiff had normal cranial nerves, and normal motor and sensory reflexes.  (Tr.

20  at 324.)  Later, in October 2008, Dr. Han noted that plaintiff's passive range of motion was intact

21  with no significant limitation and that there was no focal sensory loss, no significant muscle

22  atrophy, and no severe swelling.  (Tr. at 550.)

23  \\\\\

24

25  [6] Of course, this is not the appropriate lense with which a federal district court reviews social security cases.  Instead, the pertinent question is whether substantial evidence in the record as a whole supports the *ALJ's* findings, and more specifically here, whether the ALJ gave

26  specific and legitimate reasons for rejecting the opinion of a treating physician.

1       Plaintiff also references other objective clinical findings in an attempt to support

2 Dr. Rickertsen's diagnoses and assessed functional limitations: the March 28, 2007 MRI of the

3 lumbar spine showing moderate disk space narrowing at L5-S1 and no evidence of acute fracture

4 (tr. at 261); the January 20, 2009 CT scan of the head showing mild cerebellar tonsillar ectopia

5 and no acute intracranial abnormalities (tr. at 556); the January 20, 2009 MRI of the lumbar spine

6 with impressions of partial lumbarization of S1 and "normal study" (tr. at 558); and a January 20,

7 2009 MRI of the cervical spine showing a tiny posterior central C3-4 disk protrusion with no

8 evidence of stenosis and slight cerebellar tonsillar ectopia.  (Tr. at 557.)  However, these

9 relatively mild clinical findings do not provide any support for Dr. Rickertsen's conclusion that

10 plaintiff's conditions render her virtually incapacitated.  For the reasons discussed below, the

11 ALJ also reasonably found that plaintiff's daily activities were more expansive than Dr.

12 Rickertsen's limitations would allow.[7]

13       Furthermore, Dr. Aslie's comment, based on an MRI of the lumbar spine, that

14 plaintiff's minimally developed disk at the L5-S1 level "could predispose plaintiff to a possible

15 injury" does not suggest that plaintiff actually had any injury resulting in disabling functional

16 limitations.  (Tr. at 530.)  Additionally, although plaintiff also points to a June 20, 2007 MRI of

17 plaintiff's left knee showing an extensive bone contusion/bone bruise of the medial femoral

18 condyle, acute partial rupture of the anterior cruciate ligament, and a Grade II-III sprain of the

19 medial collateral ligament, this MRI has doubtful probative value, having been taken prior to

20 plaintiff's knee surgery.  Moreover, the ALJ adequately addressed plaintiff's post-surgery

21 residual tendonitis in the left knee by limiting her to sedentary work.  (Tr. at 23.)

22

23     [7] The ALJ also attacked Dr. Rickertsen's opinion on the grounds that he assisted plaintiff
to regain her driving privileges, which the ALJ claimed were inconsistent with some of the
limitations assessed by Dr. Rickertsen.  The ALJ did not point to which particular limitations
24 were inherently inconsistent with driving privileges, and the court is not persuaded that plaintiff's
eligibility to occasionally drive for short periods of time, by itself, necessarily undercuts Dr.
25 Rickertsen's opinion.  Nevertheless, even if this were not a sufficient reason to reject Dr.
Rickertsen's opinion, the ALJ provided other specific and legitimate reasons sufficient to reject
26 Dr. Rickertsen's opinion.

1    In light of the above, the court agrees that Dr. Rickertsen's assessment is

2 unsupported by the weight of the medical evidence in the record.  While plaintiff correctly states

3 that the ALJ should give appropriate deference to a treating physician's opinion, especially when

4 it is the most recent opinion in the record, such deference is necessarily premised on the fact that

5 the opinion is well supported by the medical evidence in the record as a whole.  See Thomas v.

6 Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ need not accept treating physician's opinion

7 that is conclusory and inadequately supported by clinical findings).

8    Furthermore, contrary to plaintiff's contention, the ALJ did not unquestioningly

9 adopt the opinion of the non-examining state agency physician, Dr. Becker, in formulating

10 plaintiff's RFC.  Instead, after carefully summarizing and considering the medical evidence from

11 all of plaintiff's treating physicians as well as Dr. Becker's assessment, the ALJ generally

12 credited Dr. Becker's postural limitations, but rejected his finding that plaintiff was capable of

13 performing light work.  (Tr. at 23.)  Acknowledging plaintiff's ongoing tendonitis in her left knee

14 and her "unresolved chronic pain of some degree" reported by plaintiff and her physicians, the

15 ALJ found plaintiff capable of performing only a limited range of sedentary work.  (Tr. at 23.)

16 The ALJ also added appropriate limitations (only occasional balancing and avoidance of

17 concentrated exposure to hazards) to account for any residual symptoms of headaches and

18 vertigo.  (Tr. at 22.)  Thus, while the ALJ's RFC assessment was partially based on Dr. Becker's

19 opinion, it was also based on the medical evidence and opinions of plaintiff's other treating

20 physicians.  See Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining

21 physicians may also serve as substantial evidence when the opinions are consistent with

22 independent clinical findings or other evidence in the record.")

23    In sum, the court concludes that the ALJ provided specific and legitimate reasons

24 for rejecting Dr. Rickertsen's opinion as to plaintiff's functional limitations and that the ALJ's

25 evaluation of the medical evidence is supported by substantial evidence and by the record as a

26 whole.

1           Whether the ALJ erred in failing to credit plaintiff's testimony and a third-party

2           statement regarding the nature and extent of her functional limitations

3           "Credibility determinations are the province of the ALJ" and are entitled to

4 deference if the ALJ provides sufficient reasoning supported by substantial evidence.  Fair v.

5 Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  A two-step analysis is used to determine whether a

6 claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations,

7 is credible.  First, the claimant "must produce objective medical evidence of an underlying

8 impairment which could reasonably be expected to produce the pain or other symptoms

9 alleged...."  Smolen, 80 F.3d at 1281 (citations omitted).  "[T]he claimant need not show that her

10 impairment could reasonably be expected to cause the severity of the symptom she has alleged;

11 she need only show that it could reasonably have caused some degree of the symptom."  Id. at

12 1282.  Second, once this initial showing is made and there is no affirmative evidence of

13 malingering, "the ALJ may reject the claimant's testimony regarding the severity of her

14 symptoms only if he makes specific findings stating clear and convincing reasons for doing so."

15 Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

16           "General findings are insufficient; rather, the ALJ must identify what testimony is

17 not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834;

18 see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In weighing a claimant's

19 credibility, the ALJ may consider, among other factors, her reputation for truthfulness;

20 inconsistencies in her statements and testimony, or between her statements or testimony and her

21 conduct; her daily activities; her work record; unexplained or inadequately explained failure to

22 seek treatment or to follow a prescribed course of treatment; and testimony from physicians and

23 third parties concerning the nature, onset, duration, frequency, severity, and effect of the

24 symptoms of which she complains.  See Smolen, 80 F.3d at 1284.  However, the ALJ may not

25 find subjective complaints incredible solely because objective medical evidence does not

26 quantify them.  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

16

1         The ALJ evaluated plaintiff's testimony regarding her symptoms and functional

2   limitations as follows:

3         The claimant alleges that her impairments cause her to lead a very
      sedentary life.  She stated she avoids stress which seems to trigger

4         headaches but she can care for herself, with some help in dressing.
      She leaves all but light cooking, cleaning, laundry, to her family

5         with whom she lives, her husband and children, a son age 15 and a
      daughter, age 13.  She cannot sit for more than 20-30 minutes; can

6         stand for 20 minutes, and walks, at most, a block.  She can carry
      less than five pounds, her hand manipulation, grasping functions

7         being bad.  Her medications cause heart burn and irritability and
      drowsiness.  (Testimony, 4E, 5E, 7E, 12F)...After careful

8         consideration of the evidence, the undersigned finds that the
      claimant's medically determinable impairments could reasonably

9         be expected to cause the alleged symptoms; however, the
      claimant's statements concerning the intensity, persistence and

10        limiting effects of these symptoms are not credible to the extent
      they are inconsistent with the above residual functional capacity

11        assessment.  There also appear to be allegations that are
      unsupported by the evidence, for example the claimant alleges very

12        limited activities of daily living..., yet she maintains a home for
      two minor children with her husband, does light cooking, dishes,

13        cleaning, laundry, occasional sewing, gardening, goes out 1-2 times
      daily, drives her children to school, attends many doctor

14        appointments, goes to church weekly, and otherwise leads a
      reasonably active life...These factors suggest the claimant's

15        allegations of severe impairment limiting her functionality are not
      completely credible.  This is not to suggest the claimant is

16        intentionally misleading this Court, however it is supportive of a
      finding that her symptoms are not as intense, persistent and

17        limiting as asserted...

18        In sum, the above residual functional capacity assessment is
      supported by the longitudinal record of minimal objective findings,

19        numerous imaging studies finding the claimant's spine and
      extremities to be unremarkable i.e. ordinary, the routine and

20        conservative treatment (except for knee surgery, and despite
      several referrals to specialists), the effective use of medications, as

21        well as the good activities of daily living.

22  (Tr. at 20-21, 24-25.)

23        As an initial matter, the court notes that the ALJ did not find that plaintiff entirely

24  lacked credibility.  The ALJ acknowledged her unresolved chronic pain of some degree and

25  accordingly assessed her as capable of performing a limited range of sedentary work.  (Tr. at 23.)

26  To the extent that the ALJ discounted plaintiff's testimony regarding her symptoms and

1    functional limitations, the ALJ provided specific, clear, and convincing reasons for doing so.

2    Although subjective complaints may not be found incredible solely because objective medical

3    evidence does not quantify them, the ALJ properly considered the minimal objective findings and

4    numerous unremarkable imaging studies in the record as a relevant factor in evaluating the

5    credibility of plaintiff's testimony.  Plaintiff's relatively conservative treatment was also a proper

6    consideration.  See Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989); Parra v. Astrue, 481 F.3d

7    742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of conservative treatment

8    is sufficient to discount a claimant's testimony regarding severity of an impairment.").[8]

9           Admittedly, the evidence regarding plaintiff's daily activities is somewhat

10   ambiguous.  On January 8, 2008, plaintiff completed a function report indicating that she does

11   not take care of family members or pets, and that she needs help to dress, care for her hair, shave,

12   and use the toilet. (Tr. at 165.)  She stated that she cooks on a weekly basis, but that it takes her

13   all day; does laundry once a week all day with assistance; and does dishes every other day for 1-2

14   hours with assistance.  (Tr. at 166.)  She also stated that she goes out one or two times a day by

15   herself, drives, shops in stores and by phone for groceries, does sewing once a week, gardens

16   about once a month, and goes to church once a week (but needs someone to accompany her).

17   (Tr. at 167-68.)  A third-party function report completed that same day by her husband, Dinaand

18   Nath, repeats plaintiff's account of her daily activities virtually verbatim.  (Tr. at 156-63.)  On

19   February 8, 2008, plaintiff reported to consulting examiner and psychologist Dr. Travis Owens

20   that, during the day, she goes to doctor's appointments, picks up her kids from school, reads

21   books, and helps her children with homework.  For fun and recreation, she liked to go shopping,

22

23          [8] The ALJ also referenced the effective use of medications as a reason to partially
     discredit plaintiff's testimony.  However, even though plaintiff at times reported relief with
     medication, she fairly consistently complained that the relief was short-lived or minimal.
24   Nonetheless, any error in relying on this reason is harmless, because the ALJ provided several
     other valid reasons for only partially crediting plaintiff's testimony.  See Molina v. Astrue, 674
25   F.3d 1104, 1115 (9th Cir. 2012) (harmless error when ALJ provided one or more invalid reasons
     for disbelieving a claimant's testimony, but also provided valid reasons that were supported by
26   the record).

1   although it was difficult for her since the knee problems began.  She reported that she could do

2   no chores due to her limited physical mobility, but that she could shop for groceries or clothing,

3   although slowly.  (Tr. at 459.)  At the September 2009 hearing, plaintiff testified that she did very

4   little cooking – mostly heating food up, making salads, and cooking noodles.  (Tr. at 56.)  She

5   did not clean, mop, or vacuum, or scrub the bathroom, and did not usually make her bed or

6   change the sheets.  (Tr. at 57.)  She did help with folding laundry while sitting down.  (Tr. at 57.)

7   She testified that she occasionally went to the grocery store, but did not attend her son's sports

8   events.  (Tr. at 57-58, 61.)  Plaintiff further stated that she did "basically nothing" during the day

9   and just tried to do whatever she could when she was sitting.  (Tr. at 63.)

10          As noted above, it is the function of the ALJ to resolve any ambiguities, and the

11   court finds the ALJ's interpretation of plaintiff's testimony here to be reasonable and supported

12   by substantial evidence.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (affirming

13   ALJ's credibility determination even where the claimant's testimony was somewhat equivocal

14   about how regularly she was able to keep up with all of the activities and the ALJ's interpretation

15   "may not be the only reasonable one").  Indeed, evidence that plaintiff may not be able to

16   perform more taxing household chores requiring extended standing and awkward posturing does

17   not necessarily preclude a finding that plaintiff is capable of performing a limited range of

18   sedentary work.  As the Ninth Circuit explained:

19          It may well be that a different judge, evaluating the same evidence,
       would have found [the claimant's] allegations of disabling pain
20          credible.  But, as we reiterate in nearly every case where we are
       called upon to review a denial of benefits, we are not triers of fact.
21          Credibility determinations are the province of the ALJ...Where, as
       here, the ALJ has made specific findings justifying a decision to
22          disbelieve an allegation of excess pain, and those findings are
       supported by substantial evidence in the record, our role is not to
23          second-guess that decision.

24   Fair, 885 F.2d at 604.  In any event, as outlined above, the ALJ did not rely solely on plaintiff's

25   daily activities, but also took into account the lack of objective medical findings and plaintiff's

26   relatively conservative treatment in discounting plaintiff's testimony.

19

1          Finally, plaintiff argues that the ALJ improperly discounted plaintiff's husband's

2    third party statement regarding plaintiff's functional limitations.  "[C]ompetent lay witness

3    testimony cannot be disregarded without comment" and "in order to discount competent

4    witness testimony, the ALJ must give reasons that are germane to each witness." Molina v.

5    Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (internal quotation and citation omitted).  Here, the

6    ALJ did not disregard Mr. Nath's statement without comment, but stated that "[t]he claimant's

7    allegations are confirmed and supplemented by the testimony of her husband of 23 years with

8    whom she lives, Devanand Nath, which information is acknowledged as credible but accorded no

9    weight since it is not an opinion from an acceptable medical source under the rules and

10   regulations." (Tr. at 24.)  This was error, because Mr. Nath's statement was not offered as

11   medical opinion evidence, but instead as competent lay witness testimony.  See 20 C.F.R. §

12   416.913(d).

13         However, in this case, Mr. Nath's statement essentially echoed plaintiff's

14   testimony and, as discussed above, the ALJ already provided specific, clear, and convincing

15   reasons for discounting plaintiff's testimony.  Although the ALJ found that Mr. Nath, like

16   plaintiff, was generally credible and had no intent to deceive the ALJ, the reasons given for

17   rejecting plaintiff's testimony are equally germane to Mr. Nath's statement.  As such, any error

18   was harmless and remand is not warranted.  See Molina, 674 F.3d at 1115-22.

19              Whether the ALJ erred in failing to credit the vocational expert's testimony in

20              response to the hypothetical that reflected plaintiff's limitations as assessed by her

21              treating physician Dr. Rickertsen

22         Because the court found that the ALJ properly evaluated the medical evidence and

23   properly discounted plaintiff's and her husband's testimony/statements regarding her symptoms

24   and functional limitations, the court also concludes that the assessed RFC is supported by

25   substantial evidence and the record as a whole.  Therefore, the ALJ properly relied on the

26   vocational expert's testimony based on that RFC.

CONCLUSION

Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment (dkt. no. 15) is DENIED;

2.  Defendant's cross-motion for summary judgment (dkt. no. 21) is GRANTED; and

3.  Judgment is entered for defendant.

DATED: June 13, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH/wvr
Nath.1441.ss.wpd